STERLING NATIONAL
BANK, Plaintiff,

v.

A–1 HOTELS INTERNATIONAL, INC.,
Jacob Laufer, Norman Mattie Gold-
stein, and 78th Rd. Realty Corp., De-
fendants.

No. 00Civ.7352(GEL).

United States District Court,
S.D. New York.

May 4, 2001.

**574**

Morton J. Turchin, Turchin & Hoffman, PC, New York City, for Sterling National Bank.

David M. Blum, New York City, for A–1 Hotels, et al.

## OPINION AND ORDER

LYNCH, District Judge.

In this civil RICO action, plaintiff Sterling National Bank alleges that defendants submitted over two hundred fraudulent and unauthorized credit card charges in the course of a scheme to purposefully defraud plaintiff and a third-party credit card processor. For details of the allegations of the complaint, *see Sterling National Bank v. A–1 Hotels International, Inc.,* No. 00 Civ. 7352(GEL), 2001 WL 282687 (S.D.N.Y. March 22, 2001). On May 1, 2001, defendants moved to stay the immi-

nent depositions of defendants Norman Goldstein and Jacob Laufer, pending resolution of a federal criminal investigation of matters related to this case. For the reasons set forth below, the motion is denied.

## Background

Sterling is in the business of providing, among other services, "credit card services to merchants." (Compl.¶¶ 2, 11.) Defendant Jacob Laufer is the President and sole or majority shareholder of defendant A–1 Hotels International Inc. (*id.* ¶ 4), a New York corporation engaged in the principal business of booking hotel reservations for corporations and individuals throughout the United States and in resort areas outside the United States (*id.* ¶ 10). Defendant Norman Goldstein is the operating and managing officer and Vice President of A–1 Hotels. (*Id.* ¶ 5.) Essentially, Sterling alleges that in December 1996, A–1 Hotels entered into an agreement with Sterling, under which A–1 Hotels would accept customer charges on Visa and MasterCard, reserve hotel rooms for customers, and pay the hotel, while Sterling agreed to process and purchase the debt resulting from such customer charges (*Id.* ¶¶ 11–12.) Although the agreement guaranteed the validity of all charges presented by A–1 Hotels to Sterling (*id.* ¶ 14), Sterling charges that sometime in 1998, defendants Laufer and Goldstein began intentionally to submit charges they knew to have been unauthorized by customers of A–1 Hotels. (*Id.* ¶ 17.) Laufer and Goldstein allegedly submitted in excess of two hundred such charges to Sterling over the course of approximately two years. (*Id.* ¶ 18 & Ex. 1). As a result, Sterling alleges it was defrauded in an amount exceeding $750,000. (*Id.* ¶ 22.)

Although the complaint in this case was filed on September 28, 2000, resolution of the dispute has been delayed by a series

of intentional or inadvertent actions of defendants and their counsel. After twice receiving extensions of time to answer, defendants apparently served plaintiff with an answer on December 17, 2000, although counsel failed to properly file the answer. By a scheduling order entered on November 28, 2000, defendants' motion to dismiss was due on December 18, 2000, but that motion too was filed, along with the answer, only on March 12, 2001, after repeated requests from chambers, and a conference at which defendants were threatened with default. Needless to say, defendants failed to provide discovery properly demanded by plaintiff during this period, and the Court entered a revised scheduling order extending the discovery deadline from March 30, 2001, to May 16, 2001.

On March 22, 2001, the Court for the most part denied the motion to dismiss. *Sterling National Bank,* 2001 WL 282687.[1] Although document discovery has now been provided, defendants now move to stay the scheduled depositions of Laufer and Goldstein, for at least six months. Citing a grand jury subpoena duces tecum served in January 2001 on defendant A–1 Hotels, and subsequent inquiries by a special agent of the Federal Bureau of Investigation, they argue that they will be prejudiced if discovery is allowed to proceed, by being put to the choice of providing testimony that might assist the grand jury's criminal inquiries, or asserting their Fifth Amendment privilege, to the detriment of their defense of the instant civil

suit. Plaintiff responds that it is entitled to proceed to resolution of its claims against defendants, by whom it claims it was defrauded, rather than being compelled to wait for what may turn out to be an indefinite period of time, while the government and grand jury complete its inquiries, perhaps bring an indictment, and then litigate the resulting criminal case.

## Discussion

There is no question that parties who face both civil litigation and criminal investigation face difficult choices. At the same time, parties who claim to have been victimized by frauds or other crimes are entitled to pursue their civil remedies, and it would be perverse if plaintiffs who claim to be the victims of criminal activity were to receive slower justice than other plaintiffs because the behavior they allege is sufficiently egregious to have attracted the attention of the criminal authorities.[2] The dilemma recurs with sufficient regularity that a consensus has developed on the principles to be applied by district judges in determining motions to stay civil actions while criminal litigation is conducted.

■ First, it is common ground that the Court has the power to enter such a stay:

The power to stay a civil proceeding by reason of a pending criminal investigation is within a court's inherent discretionary power, although a defendant must show "undue prejudice ... or interference with his constitutional rights

---

1. On April 19, 2001, defendants filed a notice of appeal from this unappealable, interlocutory order. *See, e.g.,* 28 U.S.C. §§ 1291, 1292 (courts of appeals have jurisdiction of appeals "from all final decisions of the district courts"); *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S.Ct. 1494, 103 L.Ed.2d 879 (1989) (a final decision "ends the litigation on the merits and leaves nothing for the court to do but execute judgment").

2. As the great Judge Edward Weinfeld put it, "That defendant's conduct also resulted in a criminal charge against him should not be availed of by him as a shield against a civil suit and prevent plaintiff from expeditiously advancing its claim." *Paine, Webber, Jackson & Curtis, Inc. v. Malon S. Andrus, Inc.,* 486 F.Supp. 1118, 1119 (S.D.N.Y.1980).

... [to] prevent plaintiff from expeditiously advancing its claims."

*Citibank, N.A. v. Hakim,* No. 92 Civ. 6233(MBM), 1993 WL 481335, at *1 (S.D.N.Y. Nov. 18, 1993) (quoting *Paine, Webber,* 486 F.Supp. at 1119).

█ Second, it is equally well understood that such a stay is not constitutionally required whenever a litigant finds himself facing the dilemmas inherent in pursuing civil litigation while being the subject of a related criminal investigation:

The Constitution does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings. *Federal Sav. & Loan Ins. Corp. v. Molinaro,* 889 F.2d 899, 902 (9th Cir.1989); *Securities & Exchange Commission v. Dresser Indus.,* 628 F.2d 1368, 1375 (D.C.Cir.1980). "In the absence of substantial prejudice to the rights of the parties involved, [simultaneous] parallel [civil and criminal] proceedings are unobjectionable under our jurisprudence." *Dresser,* 628 F.2d at 1374.

*Keating v. Office of Thrift Supervision,* 45 F.3d 322, 324 (9th Cir.1995) (bracketed insertions in original). *See also Nosik v. Singe,* 40 F.3d 592, 596 (2d Cir.1994) ("Nothing in the Constitution forbids contemporaneous civil and criminal proceedings concerning the same subject matter") (internal citations omitted).

█ Third, in exercising its "discretion" to stay criminal proceedings " 'when the interests of justice seem[ ] to require such action,' " *Dresser,* 628 F.2d at 1375 (quot-

ing *United States v. Kordel,* 397 U.S. 1, 12 n. 27, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970)), a district court must make a highly factbound inquiry into the "particular circumstances and competing interests involved in the case." *Molinaro,* 889 F.2d at 902. This requires an inquiry into a variety of factors, including "the extent to which the defendant's fifth amendment rights are implicated," *id.,* as well as such factors as

(1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Keating,* 45 F.3d at 325 *See also Morris v American Federation of State, County and Municipal Employees,* 99 Civ 5125(SWK), 2001 WL 123886, at *2 (S.D.N.Y. Feb. 21, 2001) (applying factors) (internal citation omitted)

█ Fourth, some practical rules of thumb have developed from the consideration of these rather abstract guidelines. For one thing, district courts in this Circuit "generally grant the extraordinary remedy of a stay only after the defendant seeking a stay has been indicted." *Hakim,* 1993 WL 481335 at *1.[3] This is, at

---

**3.** In support of this proposition, the court in *Hakim* cited *In re Par Pharmaceutical,* 133 F.R.D. 12, 13 (S.D.N.Y.1990)("The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment, ... but will deny a stay of the civil proceeding where no indictment has issued") (internal citations omitted); *United States v. Private*

*Sanitation Indus. Ass'n,* 811 F.Supp. 802, 805 (E.D.N.Y.1992) ("since [defendant] has yet to be indicted by any grand jury, his motion to stay may be denied on that ground alone"); *United States v. District Council of New York City,* 782 F.Supp. 920, 925 (S.D.N.Y.1992) ("courts in this district will deny a stay of the civil proceeding where no indictment has issued") (internal quotation marks and cita-

best, a guide to the exercise of discretion, and not a hard-and-fast rule. There is no question that a court has discretion to stay a civil litigation even in favor of a pending investigation that has not ripened into an indictment, *see, e.g., Walsh Securities, Inc. v. Cristo Property Mgmt., Ltd.,* 7 F.Supp.2d 523, 527 (D.N.J.1998) ("It is 'still possible' to obtain a stay, even though an indictment or information has not yet been returned, if the Government is conducting an active parallel criminal investigation") (quoting Milton Pollack, *Parallel Civil and Criminal Proceedings,* 129 F.R.D. 201, 204 (1989)), and that each case must be evaluated individually. *See, e.g., Volmar Distributors, Inc. v. New York Post Co.,* 152 F.R.D. 36, 38 (S.D.N.Y.1993) (balancing relevant factors "is a case-by-case determination, with the basic goal being to avoid prejudice"). However, the consensus that a party seeking a stay bears a heavier burden when he has not yet been indicted derives logically from the balancing test set out by the courts of appeals that have considered the question.

When a defendant has been indicted, his situation is particularly dangerous, and takes a certain priority, for the risk to his liberty, the importance of safeguarding his constitutional rights, and even the strain on his resources and attention that makes defending satellite civil litigation particularly difficult, all weigh in favor of his interest. Moreover, if the potential prejudice to the defendant is particularly high post-indictment, the prejudice to the plaintiff of staying proceedings is somewhat reduced, since the criminal litigation has reached a crisis that will lead to a reasonably speedy resolution. *See* 18 U.S.C.

§§ 3161–74 (Speedy Trial Act). Furthermore, at that stage in the criminal proceeding, the contours of the indictment will provide the Court with a reasonable basis for determining the extent of the threat to the defendant's Fifth Amendment rights, and the likely extent and timing of the criminal litigation.

Pre-indictment, these factors must be balanced significantly differently. Though many of the same risks to the civil defendant are present, the dangers are at least somewhat more remote, and it is inherently unclear to the Court just how much the unindicted defendant really has to fear. Conversely, the delay imposed on the plaintiff is potentially indefinite. There is no telling how complicated the government's investigation may be, whether the allegations of the particular civil plaintiff are merely the tip of an iceberg that will result in a lengthy and open-ended investigation, what priority the government assigns to the investigation, whether it will result in charges that will have to be litigated, or how time-consuming the resulting criminal case will be. Under these circumstances, the likelihood that a civil party can make the necessary showing to obtain the "extraordinary" remedy of a stay, *Weil v. Markowitz,* 829 F.2d 166, 174 n. 17 (D.C.Cir.1987) (granting a "stay of civil discovery pending the outcome of related criminal matters is an extraordinary remedy appropriate for extraordinary circumstances"), is inevitably much reduced.

■ With these principles in mind, the Court turns to balancing the interests of the parties in this particular case. As noted, the defendants here certainly face a

tions omitted); *Kudo v. Simels,* No. 91 Civ. 3167(JFK), 1992 WL 80762, at *2 (S.D.N.Y. April 8, 1992) ("In this circuit, district courts generally take the extraordinary step of issuing a stay only after a criminal investigation has resulted in an indictment") (internal cita-

tions omitted). *See also Fidelity Funding of California v. Reinhold,* 190 F.R.D. 45, 52–53 (E.D.N.Y.1997) (stay granted as to indicted defendant, denied as to defendant who had not yet been indicted).

potential threat to their Fifth Amendment rights. There is no question that any defendant facing parallel criminal and civil litigation is hard put to decide whether to waive the privilege and give potentially damaging testimony or to assert it at the risk of having a Court or jury draw adverse inferences against him in the civil case. *See, e.g., Baxter v. Palmigiano*, 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (no constitutional bar to adverse inferences drawn against parties to civil actions when they refuse to testify). And this Court is highly cognizant of the importance of assuring that "exercise of Fifth Amendment rights should not be made unnecessarily costly." *United States v. Certain Real Property*, 55 F.3d 78, 84 (2d Cir.1995) (citing *Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967)).[4]

■ Nevertheless, defendants here can point to nothing that suggests that the dilemma they face is more pointed or difficult than in any other case of parallel proceedings, and it is universally agreed that the mere pendency of a criminal investigation standing alone does not require a stay. *See, e.g., Keating*, 45 F.3d at 324; *Arden Way Assocs. v. Boesky*, 660 F.Supp. 1494, 1497 (S.D.N.Y.1987) ("a policy of issuing stays 'solely because a litigant is defending simultaneous lawsuits would threaten to become a constant source of delay and an interference with judicial administration'") (quoting *Paine, Webber*, 486 F.Supp. at 1119). As defendants concede, "forcing a [d]efendant to choose between waiving his Fifth Amendment privilege or suffering the adverse inference which results in the civil case from invok-

ing his privilege does not violate due process." (Def.'s Mem. 4) (citing *United States v. Kordel*, 397 U.S. 1, 9–10, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970).) There is no indication whatever that the grand jury's investigation has reached a critical stage; only one document subpoena, issued in January 2001, and some investigative inquiries by an FBI agent, have been called to the Court's attention; defendants do not assert that the government has sought to subpoena or interview the individual defendants, there is nothing to suggest that indictments are imminent. While it can be assumed on this record that there is substantial overlap between the allegations in this complaint and the grand jury's investigation, which defendants assert was triggered by the filing of a suspicious activity report by Sterling (Def.'s Mem. 2–3), the Court has no way of knowing whether the grand jury's inquiry has expanded or will expand beyond these allegations. Moreover, since depositions have not yet taken place, there is no way of measuring with any precision what questions defendants may refuse to answer, or what damage may be done to their position in the civil case by any assertions of privilege they might choose to make. Perhaps at some later stage of this litigation, the Court will be in a better position to "further the goal of permitting as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege." *Certain Real Property*, 55 F.3d at 84. At this point, however, the nature of the threat to defendants' Fifth Amendment rights is necessarily still imprecise.

Moreover, this is not a case in which the government itself has an opportunity to

---

4. While recognizing that the exercise of Fifth Amendment rights should not be unduly or unnecessarily burdened, it is important also to note that ultimately, there is no threat that defendants will be deprived of those rights. They retain the absolute right to invoke the privilege. Ultimately, what is at risk is not their constitutional rights—for they cannot be forced to testify, and under *Baxter*, any adverse consequence in the civil litigation is consistent with the constitutional guarantee—but their strategic position in the civil case.

escalate the pressure on defendants by manipulating simultaneous civil and criminal proceedings, both of which it controls. *Cf. Kordel*, 397 U.S. 1, 90 S.Ct. 763 (FDA *in rem* civil seizure and criminal case); *Certain Real Property*, 55 F.3d 78 (civil forfeiture action and criminal proceedings); *Dresser*, 628 F.2d 1368 (SEC civil proceedings and criminal investigation); *Brock v. Tolkow*, 109 F.R.D. 116 (E.D.N.Y.1985) (Labor Dept. civil action under ERISA and grand jury investigation). In such circumstances, there is a special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means. In that special situation, the risk to individuals' constitutional rights is arguably magnified. Defendants here attempt to raise a similar specter by pointing out that the plaintiff, as the alleged crime victim, may choose to share information it obtains with the government. (Def.'s Mem. 3.) But that is hardly the same thing. Plaintiff is a private entity, with interests distinct from those of the government. There is no reason to assume that its civil case is simply a stalking horse for the government's criminal inquiry, rather than a good faith effort to obtain compensation for its own private injuries. *See, e.g., Hakim*, 1993 WL 481335, at *2 ("the potential for prejudice is diminished where, such as here, a private party, not the government, is the plaintiff in the civil action"); *Brock*, 109 F.R.D. at 119 (stay is "more appropriate when both actions are brought by the government").

In contrast to the speculative and uncertain risks to defendants' interests, "the interest of the plaintiffs in proceeding expeditiously with this litigation," *Keating*, 45 F.3d at 325, is pronounced. This case has been pending for eight months, and most of that time has been essentially wasted due to defendants' dilatory tactics. If a further six months' delay were granted, the case would be over a year old, and discovery would still not be complete. It is unclear whether defendants have sufficient assets to permit any meaningful recovery, and permitting a further delay during which assets can be dispersed or hidden—or called upon for the expensive business of defending a grand jury investigation and potential criminal litigation—will increase the risks that plaintiff could succeed in the litigation, without being able to collect on any judgment.[5]

Defendants argue that they seek a stay not of the entire case, but only of particular depositions. (Def.'s Mem. at 5–6.) In practice, however, the relief sought effectively stops the case in its tracks. Document discovery has been completed, the discovery deadline approaches, and the depositions demanded by plaintiff in effect are all that remains to be done for the case to proceed to trial. It is far from clear, moreover, that the delay will be limited to the initial six months requested by defendants. If a stay is granted, it is completely unpredictable how the criminal investigation will have progressed over the next six months. Unless the government has completed its investigation by that time, and is prepared to say that it will not bring

---

5. Plaintiff contends that the document discovery to date "has revealed massive transfers of funds, more than one million dollars in four months, from Defendant A–1 Hotels to Defendant 78 th Road Realty, which had been represented as merely owning a one family home where some of the Defendants reside"—a remarkable figure, given that A–1 Hotels apparently had only three million dollars in annual gross billings. (Pl.'s Letter in Resp. to Def.'s Mot. for Stay, May 2, 2001, at 1.) Such evidence not only supports the inference that A–1 Hotels engaged in fraudulent billing of Sterling, but also raises grave questions about where the proceeds went, and how they will be able to be recovered.

charges, the argument for a further stay will be at least as potent as it is now. Effectively, then, defendants seek to delay the entire civil case indefinitely. This is a weighty burden on plaintiff.

It is also a burden on the court's ability to manage its cases. As Chief Judge Mukasey has pointed out,

> it is unrealistic to postpone indefinitely the pending action until criminal charges are brought or the statute of limitations has run for all crimes conceivably committed by [defendants]. Such a postponement would require this court either to "rely upon fortuitous events to manage its docket," *Digital Equip. Corp. v. Currie Enters.*, 142 F.R.D. 8, 13 (D.Mass.1991), or to guess what criminal act [defendants] might be charged with, and, consequently, which limitation periods apply to those criminal acts.

*Hakim*, 1993 WL 481335 at *2.[6] As noted, the stay requested would substantially halt the civil litigation indefinitely, without any predictability as to when the case would return to the Court's active docket.[7]

Finally, the interests of non-parties and the public favors prompt resolution of the civil case. "[T]he public interest in financial institutions['] promptly recovering misappropriated funds is significant, particularly when weighed against the interest in a merely conjectural criminal prosecution." *Id.* at *3.[8] Civil RICO suits were intended in large part to give private parties an incentive to supplement the government's limited resources for pursuing criminal activity. While commentators have questioned its success in this regard, *see, e.g.,* Gerard E. Lynch, *How Useful is Civil RICO in the Enforcement of Criminal Law?*, 35 Villanova Law Review 929 (1990), the conduct alleged in this case is unquestionably the sort of criminal conduct for which RICO is appropriately invoked. *Sterling National Bank,* 2001 WL 282687, at *3–*4 (refusing to dismiss RICO claims) It is not uncommon that government investigations give priority to victims less able to protect themselves than major financial institutions, and it would ill serve the public interest to stay the private enforcement action, thus either forcing the government to consume resources that might better be spent on other priorities, or remitting the plaintiff to a criminal remedy that might,

---

**6.** It is worth pointing out that because Sterling, the alleged victim of the crimes alleged in this complaint, is a financial institution, the statute of limitations for many of the crimes presumably being considered by the grand jury is ten years. 18 U.S.C. § 3293. As a former supervising prosecutor, I am well aware that one of the unfortunate effects of extended statutes of limitations is the removal of urgency from the government's investigative processes. Faced with the difficult task of allocating scarce investigative and prosecutorial resources, the government not unexpectedly gives a more urgent priority—other things being equal—to cases where limitations deadlines impend over cases where the limitations date is far off. Legislators considering extending the limitations period for particular crimes might do well to consider this effect. For purposes of this case, the extended limitations period gives grounds for particular caution about the likely pace of the government's inquiries.

**7.** Defendants attempt to distinguish *Hakim* by arguing that because the grand jury "is investigating the same allegations that are contained in the complaint, ... we know exactly what criminal acts the defendant might be charged with." (Def.'s Mem. 7.) But as noted above, in light of the secrecy and sweeping powers of grand jury investigations, it seems overly sanguine to assume that the parties or the Court can predict the reach of the grand jury's investigation, or the charges likely to result.

**8.** Defendants acknowledge the legitimacy and importance of this interest (Def.'s Mem. 7), arguing only that it is outweighed by the importance of protecting their Fifth Amendment rights.

for the government's own reasons, never be sought. The public's interest in enforcement of the criminal laws thus favors allowing this case to proceed in the normal fashion.

Accordingly, after careful consideration of the applicable factors, the balance tilts strongly against the application for a stay.

*Conclusion*

For the above reasons, the defendants' motion to stay their scheduled depositions is denied. The discovery deadline is extended until June 1, 2001, to give plaintiff adequate time to conduct the necessary depositions.

SO ORDERED.