[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 778 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 779 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 780 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 781 
In this opinion we address two petitions for a writ of mandamus directed at orders entered by Judge Charles Price in a case pending before him in the Montgomery Circuit Court. That case is styled:
 "THE RETIREMENT SYSTEMS OF ALABAMA consisting of THE EMPLOYEES RETIREMENT SYSTEM OF ALABAMA AND THE TEACHERS RETIREMENT SYSTEM OF ALABAMA; THE PUBLIC EDUCATION EMPLOYEES' HEALTH INSURANCE FUND; THE PUBLIC EMPLOYEES INDIVIDUAL RETIREMENT ACCOUNT FUND; THE CLERKS' AND REGISTERS' SUPERNUMERARY FUND; THE WILDLIFE AND FRESHWATER FISHERIES FUND; THE ALABAMA CULTURAL RESOURCES PRESERVATION TRUST FUND; AND THE ALABAMA TRUST FUND, Plaintiffs
"vs.
 "J.P. MORGAN CHASE CO., J.P. MORGAN SECURITIES, INC., CITIGROUP, INC., SALOMON SMITH BARNEY, INC., ARTHUR ANDERSEN, LLP, BANK OF AMERICA CORP., BANC OF AMERICA SECURITIES LLC, BERNARD J. EBBERS, SCOTT D. SULLIVAN, BEAR STEARNS CO., INC., [and numerous fictitiously named parties], Defendants."
That litigation arises out of the financial collapse of the telecommunications corporation WorldCom, Inc., which in July 2002 filed for protection under Chapter 11 of the United States Bankruptcy Code. A number of other civil actions have been filed against one or more of the defendants in this case, as detailed in In re WorldCom, Inc., SecuritiesLitigation/In re WorldCom, Inc., Erisa Litigation (No. 02 Civ. 3288) (S.D.N.Y. Dec. 5, 2002) (not published in F. Supp.), describing the centralization under United States District Court Judge Denise L. Cote of the Southern District of New York of 40 WorldCom-related class actions, the first of which was filed on April 30, 2002 (hereinafter "the WorldCom litigation"). Sullivan and Ebbers are defendants in the WorldCom litigation, along with some of the entity defendants in this case. *Page 782 
Filed on July 15, 2002, this case is proceeding under the allegations presented in the third amended complaint filed February 20, 2003. The plaintiffs identify themselves in that pleading variously as public corporations, public retirement funds, or "other funds" and state that they are all instrumentalities or "arms" of the State of Alabama. They designate themselves collectively as "The Retirement Systems of Alabama" (hereinafter "RSA"). Defendant Bernard Ebbers, a resident of Mississippi, is the former president and chief executive officer of WorldCom. Defendant Scott D. Sullivan is the former chief financial officer of WorldCom. Both also served on the board of directors of WorldCom. Defendant Arthur Andersen, LLP, is identified in the complaint as an international accounting and consulting firm that provided various auditing, accounting, consulting, tax, and document-review services for WorldCom. The other seven entity defendants are various investment and brokerage houses that RSA describes in its complaint as WorldCom's "principal Investment Banks." Six of them — Salomon Smith Barney, Inc., J. P. Morgan Securities, Inc., Banc of America Securities LLC, Bank of America Corp., CitiGroup, Inc., and J. P. Morgan Chase Co. — jointly filed one of the petitions for a writ of mandamus (case no. 1021008) and are hereinafter referred to as "the Bank defendants"; the other petition was filed by Ebbers (case no. 1020931). Arthur Andersen is not a participant in these appellate proceedings. Bear Stearns Co., Inc., another defendant, is not a participant in either of the two mandamus proceedings addressed in this opinion.[1]
Scott Sullivan also has filed no submission in either proceeding. Accordingly, in the final analysis, the participating parties before this Court are RSA, Ebbers, and the Bank defendants.
In its third amended complaint, RSA asserts claims against the defendants under the "strict liability" provisions of §§ 11 and 12(a)(2) of the Securities Act of 1933, under § 8-6-19(a), Ala. Code 1975, a part of the Alabama Securities Act, and under the statutory and common law of the State of Alabama. RSA alleges that the defendants, either individually or in concert and conspiracy with WorldCom and certain of its top officers, principally Ebbers and Sullivan, engaged in various accounting machinations and irregularities and issued various materially misleading financial reports and statements, so that WorldCom's earnings were overstated by $9,000,000,000 and its assets "must be written down by as much as sixty-six billion dollars ($66,000,000,000.00)." RSA asserts that it was misled by the information generated or reported by the defendants to purchase various WorldCom securities, resulting in losses to RSA of more than $275,000,000. RSA seeks to recover those losses as well as punitive damages. The claims and theories of liability asserted by RSA are legally and factually complex.[2] *Page 783 
However, for the purpose of presenting, analyzing, and deciding the issues raised by the two petitions for the writ of mandamus, the highly condensed summary of the nature of this litigation set out above will suffice.
In addition to being named as a defendant in both this case and the WorldCom litigation, Sullivan has been indicted by a federal grand jury in the Southern District of New York on charges of conspiracy to commit securities fraud, securities fraud, and making false filings with the Securities and Exchange Commission.[3] Indicted jointly with Sullivan was Burford Yates, Jr., a certified public accountant who served as WorldCom's director of general accounting. Yates has already pleaded guilty, pursuant to a cooperation agreement with the United States attorney for the Southern District of New York, to the conspiracy and fraud counts of the indictment. Three other former officers of WorldCom have also been indicted as a result of their participation in the scheme to inflate artificially WorldCom's earnings by means of various accounting irregularities. All three of those officers have likewise pleaded guilty.
Ebbers has not been indicted, but he has been the subject of an ongoing criminal investigation. The probability/possibility of an indictment ultimately being returned against him was the subject of much discussion and argument before Judge Price.
Based on the indictment of Sullivan and the ongoing criminal investigation of Ebbers during the pendency of the RSA litigation, Sullivan and Ebbers each moved Judge Price to stay the RSA litigation as to them. The motion to stay filed by Ebbers on December 24, 2002, is among the materials submitted in connection with his petition for mandamus, but no party has supplied a copy of the motion for a stay filed by Sullivan.[4] Judge Price conducted a hearing on Ebbers's and Sullivan's motions on February 14, 2003. Although Ebbers asserted in his motion that a stay of the case as to him was necessary to preserve his rights "under the First, Fourth, Fifth, Sixth, and Ninth Amendments to the United States Constitution and the Alabama Constitution," he did not identify any applicable provision of the Alabama Constitution and in a supporting memorandum brief he referenced only the Fifth Amendment to the United States Constitution ("the Fifth Amendment"). All counsel referred only to the Fifth Amendment in arguing the stay motions before Judge Price at the February 14 hearing.
Counsel for RSA advised Judge Price at that hearing that the criminal charges against Sullivan were set for trial before Judge Barbara S. Jones, United States District Judge for the Southern District of New York, on September 8, 2003. *Page 784 
Sullivan's counsel confirmed that status and further advised Judge Price that Judge Cote had granted Sullivan's motion for stay in the WorldCom litigation because of his indictment and pending criminal trial. Ebbers, for his part, argued that the ongoing criminal investigation into his activities posed a sufficient risk of self-incrimination so as to implicate his Fifth Amendment right not to be compelled to be a witness against himself and that, if no stay of discovery was granted as to him in the RSA litigation, he would be forced to choose between either waiving that right and risking self-incrimination, or asserting it, in which event his refusal to respond could be the subject of adverse comment at trial in the RSA litigation. On February 26, 2003, Judge Price entered an order that, relying on the fact that Sullivan was under indictment and "his trial is set for September 2003," granted Sullivan's motion for a stay, but only "until October 1, 2003." On that same day, Judge Price entered a separate order denying Ebbers's motion to stay.
At one point during the February 14 hearing, counsel for RSA had stated to Judge Price that "the best way to handle this matter is to bifurcate these proceedings and . . . deny their stay with respect to Mr. Ebbers . . . [and] grant the motion with respect to Mr. Sullivan." The proffered rationale for the separate dispositions was that both rulings would likely be reviewed by this Court, with the result that the parties could "get a full exposition of the issues." However, no party has petitioned this Court to set aside the stay order granted Sullivan. In his discussions with counsel at a later hearing, conducted on March 21, 2003, Judge Price made it clear that his opposite rulings on the two stay motions were based on the fact that Sullivan had been indicted but Ebbers had not.
On February 4, 2003, the Bank defendants filed a request for a stay in their favor "in the event" a stay was granted to either Sullivan or Ebbers. By the time of the March 21 hearing, convened to hear the Bank defendants' stay motion, Judge Price had granted the stay as to Sullivan but had denied it as to Ebbers. The Bank defendants argued at that hearing that RSA's pleadings identified Sullivan as "central to all of this litigation," described him as "the chief architect of all of the wrongful conduct," and characterized the Bank defendants as co-conspirators with him and Ebbers. They asserted that, "without the ability to get discovery from Sullivan and fully litigate the issues revolving around him, the Bank defendants will suffer extreme prejudice, and will be effectively denied their right to litigate and fully defend themselves in this case." Their counsel represented that "[o]ur clients were misled by these people just as other parties were misled." At the end of the March 21 hearing, Judge Price denied the Bank defendants' motion for a stay.
Ebbers and the Bank defendants now separately petition this Court for a writ of mandamus directing Judge Price to vacate the denials of their respective motions for a stay and to grant a stay of the RSA litigation as to them.
Because the petitions raise separate issues, and, to some extent, rely on different authorities, we will discuss them separately.
 Ebbers's Petition (case no. 1020931)
Ebbers's petition and his subsequent reply brief rely solely on the cases from this Court that have addressed the legal propriety of stays in civil cases when there are pending parallel criminal prosecutions or ongoing parallel criminal investigations. RSA argues in its answer to Ebbers's petition that, because "[t]his is purely a federal constitutional matter in a *Page 785 
potential federal prosecution in federal court wherein federal common law should control" and there is "only a threatened federal proceeding, in a federal court outside of Alabama," it is "federal caselaw, rather than Alabama cases [that] should be followed as to this issue." We disagree with that assessment.
Our caselaw, as hereinafter analyzed, is sufficiently comprehensive to provide answers to all of the issues raised by Ebbers and RSA, with one exception: This Court has repeatedly stated that in determining whether a stay or a protective order should issue in a civil case when parallel criminal prosecutions or criminal investigations are underway a trial court should weigh the movant's interest in postponing the civil action against the prejudice that might result to the other party because of delay; however, we have never undertaken to compile a detailed listing of the factors that should be considered in that weighing process. Many federal cases, on the other hand, have undertaken to delineate those factors, and we will note their lists later in this opinion. Nonetheless, we reject RSA's argument that we should adopt the position of certain federal district courts that declare definitively that a stay in a civil case is normally not appropriate if the civil defendant has not been criminally indicted.
Alabama caselaw is staunchly committed to the proposition that actual criminal charges are not necessary to justify the assertion of the Fifth Amendment privilege against self-incrimination, so long as the party moving for the stay clearly demonstrates to the trial judge that that party is the subject of an ongoing, and overlapping, criminal investigation. E.g., Ex parte Coastal Training Institute, 583 So.2d 979
(Ala. 1991). However, as discussed subsequently, the status of a pending criminal investigation can become relevant as one of the factors to be considered in the weighing process, apart from the question whether the party invoking the Fifth Amendment in refusing to respond to civil discovery is justified in asserting it.
This Court has considered in 13 cases the issue of whether a stay order should be entered in a civil case when a parallel criminal prosecution is pending, or reasonably anticipated. The first such case was Ex parteBaugh, 530 So.2d 238 (Ala. 1988).[5] It was followed by Ex parteWhite, 551 So.2d 923 (Ala. 1989); Ex parte Great Escapes Travel, Inc.,573 So.2d 278 (Ala. 1990); Ex parte Coastal Training Institute, supra; Exparte Hunt, 643 So.2d 966 (Ala. 1994); Ex parte Pegram, 646 So.2d 644
(Ala. 1994); Ex parte Hill, 674 So.2d 530 (Ala. 1996); Ex parte Price,698 So.2d 111 (Ala. 1997) ("Price I"); Ex parte Price, 707 So.2d 1105
(Ala. 1997) ("Price II"); Ex parte Weems, 711 So.2d 1011 (Ala. 1998); Exparte Windom, 763 So.2d 946 (Ala. 2000); Ex parte Williams, 775 So.2d 146
(Ala. 2000); and Ex parte Oliver, [Ms. 1020424, May 9, 2003]864 So.2d 1064 *Page 786 
(Ala. 2003).[6]
In each of our cases, beginning with Baugh and ending with Oliver, the parties apparently argued, and this Court discussed, only the application of the Fifth Amendment. Only in Costal Training was note taken of the counterpart provision in the Alabama Constitution of 1901, art. I, § 6. In that case, after stating that the movants for a stay were "asserting their Fifth Amendment privilege against self-incrimination," the Court added: "See U.S. Const., amend. V; Ala. Const. 1901, art. I,§ 6." 583 So.2d at 980 (emphasis supplied). Nowhere else in that opinion is art. I, § 6, mentioned, and all of the discussion and analysis is exclusively in terms of the Fifth Amendment.
Although, as noted earlier, Ebbers did not at any time before Judge Price identify art. I, § 6, as a ground of his motion for a stay, he argues here both his right against self-incrimination under the Fifth Amendment and his correlative right under art. I, § 6. In that regard, however, he does not suggest that his right under art. I, § 6, is in any way broader than, or different from, the right afforded him by the Fifth Amendment. Section 6 provides, in pertinent part, "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself. . . ." The Fifth Amendment provides, in pertinent part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." The Fifth Amendment is available to Ebbers in this state court proceeding through the Fourteenth Amendment of the United States Constitution. Ex parte Baugh, 530 So.2d at 241, referencing Malloy v. Hogan, 378 U.S. 1 (1964).
This Court has held that the right against self-incrimination afforded a criminal accused by art. I, § 6, is coextensive with that afforded an accused under the Fifth Amendment. Hill v. State, 366 So.2d 318, 322
(Ala. 1979).
Because Judge Price was never presented with any argument regarding the applicability of art. I, § 6, being presented rather with argument relating only to the Fifth Amendment, we will not separately analyze the effect of that provision of our state constitution. "`"[T]he standard this Court will apply on mandamus review is whether there has been a clear showing that the trial court abused its discretion."'" Ex parteAlabama Dep't of Mental Health Mental Retardation, 819 So.2d 591,595 (Ala. 2001) (quoting Ex parte HealthSouth Corp., 712 So.2d 1086, 1088
(Ala. 1997), quoting in turn Ex parte Compass Bank, 686 So.2d 1135, 1137
(Ala. 1996)). In determining, on mandamus review, whether the trial court exceeded the limits of its discretion, "the appellate courts will not reverse the trial court on an issue or contention not presented to the trial court for its consideration in making its ruling." Ex parteWiginton, 743 So.2d 1071, 1073 (Ala. 1999). Accordingly, we consider only the Fifth Amendment in determining whether Judge Price acted within his discretion in denying Ebbers's motion to stay, without attempting to discriminate between its scope and any possibly different scope of art. I, § 6.
Certain of our civil cases addressing parallel criminal charges, or threatened charges, have involved circumstances that obviated any need for a weighing process. *Page 787 
See Great Escapes Travel, supra (case remanded because civil defendants who had been criminally indicted had arguably waived their Fifth Amendment rights); Hunt, supra (trial judge's denial of stay not overturned because judge could have concluded from the evidence that the civil defendant who was facing possible criminal prosecution had waived his Fifth Amendment right); Pegram, supra (stay granted civil defendant overturned because there was no evidence that defendant was actually under any sort of parallel criminal investigation); Hill, supra (State of Alabama, as the civil plaintiff, was not entitled to stay on basis of parallel federal criminal prosecution of civil defendant because, among other things, State had no Fifth Amendment right); Weems, supra (civil and criminal proceedings held to be not actually parallel); and Windom, supra (civil defendant sought stay against the plaintiff, who was the defendant in the parallel criminal proceeding, but the plaintiff had voluntarily waived his Fifth Amendment right against self-incrimination). Therefore, we need not discuss those cases in any great detail, but will cite some of them as we discuss the following pertinent principles that have emerged from our cases:
1. A party is entitled to assert the Fifth Amendment privilege against self-incrimination although no criminal charges have been instituted, and even where the risk of prosecution is remote, so long as the party reasonably apprehends a risk of self-incrimination. A party need not be indicted to properly claim the Fifth Amendment privilege. Baugh, GreatEscapes Travel, Coastal Training, Price II, and Williams.
2. When the Fifth Amendment privilege is asserted, it is for the trial court, not the party asserting the privilege, to determine whether the party's apprehension of a risk of self-incrimination is reasonable and well-founded. Coastal Training.
3. The Fifth Amendment privilege applies in state-court civil proceedings, including depositions. Baugh, Coastal Training, Pegram, andPrice II. A party cannot be compelled to testify or compelled to provide discovery in a civil proceeding while there is a parallel criminal action pending against the party. Baugh and White.
4. The United States Constitution does not automatically require a stay of civil proceedings pending the outcome of parallel criminal proceedings or potential parallel criminal proceedings. Baugh, Coastal Training,Pegram, and Hill.
5. Whether to grant a stay to a party in a civil case who is the target of actual or threatened parallel criminal proceedings must be determined by weighing and balancing the interest of the party moving for the stay in postponing the civil action against the prejudice to the other party that might result from delay. Baugh, White, Coastal Training, Hill, PriceI, Price II, Williams, and Oliver.
6. Under Rule 26(b), Ala.R.Civ.P., parties are entitled to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," but under Rule 26(c) a party or other person from whom discovery is sought may obtain a protective order from the trial judge "for good cause shown." (Emphasis supplied.) These provisions vest broad power in the trial court to control the discovery process. Baugh, White, and Coastal Training.
7. A court has the discretion to stay civil proceedings, to postpone civil discovery, or to impose protective orders and conditions in the face of parallel *Page 788 
criminal proceedings against one of the parties when the interests of justice seem to require. Such interests include the need "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" pursuant to Rule 26(c), Ala.R.Civ.P. Baugh andCoastal Training.
8. "[The] state-court procedural considerations must at all times yield, however, to relevant federal constitutional principles." Baugh, 530 So.2d at 242 (and as quoted in Coastal Training, 583 So.2d at 981). "[W]hen state concerns for judicial economy conflict with federal constitutional rights, the state concerns must give way." White, 551 So.2d at 924. "[I]n balancing the interests of the parties, we must favor the constitutional privilege against self-incrimination over the interest in avoiding the delay of a civil proceeding." Coastal Training, 583 So.2d at 981 (also quoted in part in Price II, 707 So.2d at 1107 and Williams, 775 So.2d at 148). "[T]o the extent necessary to ensure protection of the privilege [against self-incrimination], concerns about delays must yield."Price I, 698 So.2d at 112.
9. While sometimes it is appropriate to stay an entire civil proceeding, rather than just as to the party moving for the stay, there are also situations where the right against self-incrimination can be adequately protected while the civil case proceeds in some limited way.Price I, 698 So.2d at 112 ("Certainly, it appears that discovery not requiring [the civil defendant] either to testify or produce documents could continue without putting [the defendant] in a position that might call for him to incriminate himself in order to comply."); Oliver, 864 So.2d at 1067 ("It appears that the trial court balanced the interests of the parties and concluded that the civil action could proceed in a limited way. . . . Therefore, we cannot say that [the individual defendant, sued along with several entities] has established a clear legal right to the relief requested.").
10. Sometimes the outcome of the balancing-of-interest test is such that postponing the civil action is the "only method" or "only solution" sufficient to guarantee a party to a civil action the Fifth Amendment right against self-incrimination. White, 551 So.2d at 925; CoastalTraining, 583 So.2d at 981; and Williams, 775 So.2d at 148.
11. A civil party's Fifth Amendment right against self-incrimination cannot be adequately protected by requiring him simply to assert his right to remain silent when asked specific questions during a civil deposition; such an approach construes the Fifth Amendment too narrowly. The dangers in such an approach have been identified as including the possibility of a criminal investigator's being "planted" at the deposition, the revealing by the deponent of his weak points by his selection of which questions he refuses to answer, and the opportunity presented to a prosecutor of deriving, by a point-by-point review of the civil case, a "link in the chain of evidence" that would unconstitutionally contribute to the defendant's conviction in the criminal case. Coastal Training, 583 So.2d at 981; Price II, 707 So.2d at 1107; and Williams, 775 So.2d at 148.
12. "[A] motion to stay civil discovery during the pendency of a parallel criminal proceeding is not properly granted upon speculative or conclusory grounds." Hill, 674 So.2d at 533.
13. In the event that a stay is appropriate at a particular point in time, the trial court is not precluded from subsequently entertaining a motion to dissolve the stay, if circumstances have changed in the interim in such a way as to render the *Page 789 
stay no longer appropriate. Baugh, 530 So.2d at 244-45; and Williams, 775 So.2d at 148.
In Baugh, after noting that there were "no reported decisions of the Alabama appellate courts dealing with this issue," this Court looked to two decisions of the federal circuit courts of appeals to derive and adopt the "balancing of interests" test: Wehling v. Columbia BroadcastingSystem, 608 F.2d 1084 (5th Cir. 1979), and Afro-Lecon, Inc. v. UnitedStates, 820 F.2d 1198 (Fed. Cir. 1987). The Baugh Court did not undertake an analysis of what factors and considerations should be a part of the weighing and balancing calculus, other than to note that in Afro-Lecon
the court had espoused an exercise of judgment "which must weigh compelling interests and maintain an even balance," and had citedSecurities Exchange Comm'n v. Dresser Indus., Inc., 628 F.2d 1368
(D.C. Cir. 1980), for the proposition that "`the circumstances that weigh in favor of granting a stay include malicious prosecution, the absence of counsel for defendant during depositions, agency bad faith, malicious government tactics, and other special circumstances.'" Baugh, 530 So.2d at 244 (emphasis omitted).
In White, supra, this Court identified the opposing interests that must be balanced as the civil/criminal defendant's "interest in postponing the civil actions against the prejudice that might result to the [plaintiffs] because of the delay. . . ." 551 So.2d at 925. Price II, supra, made it clear that it is the interest of the movant for the stay in postponing the civil action that constitutes one side of the scale, regardless of whether that movant be the plaintiff or the defendant.
Other than articulating these principles, none of our cases have undertaken to catalogue the various factors that might properly enter into a weighing and balancing analysis. Accordingly, we will consider the following factors that have been identified by federal cases:
1. The interest of the plaintiff in proceeding expeditiously with the civil litigation, or any particular aspect of it, and the potential prejudice to the plaintiff of a delay in the progress of that litigation.Federal Savings Loan Ins. Corp. v. Molinaro, 889 F.2d 899 (9th Cir. 1989); United States v. Private Sanitation Indus. Ass'n ofNassau/Sufffolk, Inc., 811 F. Supp. 802 (E.D.N.Y. 1992) ("PSI");International Business Machines v. Brown, 857 F. Supp. 1384 (C.D.Cal. 1994) ("IBM"); Trustees of Plumbers Pipefitters Nat'l Pension Fundv. TransWorld Mech., Inc., 886 F. Supp. 1134 (S.D.N.Y. 1995) ("Trustees"); Jackson v. Johnson, 985 F. Supp. 422 (S.D.N.Y. 1997);Federal Trade Comm'n v. J.K. Publ'ns, Inc., 99 F. Supp.2d 1176 (C.D.Cal. 2000) ("FTC"); Morris v. American Fed'n of State, County, MunicipalEmployees (No. 99 Civ. 5125) (S.D.N.Y. February 9, 2001) (not published in F. Supp.); Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,175 F. Supp.2d 573 (S.D.N.Y. 2001); Public Credit Corp. v. Autorino
(No. Civ. 399CV286) (D.Conn. 2001) (not published in F. Supp.); andWorldCom Litigation, supra.
2. The private interest of the defendant and the burden that any particular aspect of the proceedings may impose on the defendant.Molinaro, PSI, IBM, Jackson, FTC, Morris, Sterling, and WorldComLitigation.
3. The extent to which the defendant's Fifth Amendment rights are implicated/the extent to which the issues in the criminal case overlap those in the civil case. Molinaro, IBM, Trustees, Sterling, and WorldComLitigation. *Page 790 
4. The convenience of the court in the management of its cases, and the efficient use of judicial resources. Molinaro, PSI, IBM, Trustees, FTC,Morris, Sterling, Republic Credit, and WorldCom Litigation.
5. The interest of persons not parties to the civil litigation.Molinaro, PSI, Jackson, FTC, Morris, Sterling, and Republic Credit.
6. The interest of the public in the pending civil and criminal litigation. Molinaro, PSI, Trustees, Jackson, Morris, Sterling, RepublicCredit, and WorldCom Litigation.
7. The status of the criminal case, including whether the party moving for the stay has been indicted. Trustees, Morris, PSI, Sterling, RepublicCredit, and WorldCom Litigation.
8. The timing of the motion to stay. Republic Credit.
Obviously, a trial court "must make a highly fact-bound inquiry into the `particular circumstances and competing interest involved in the case'" when parallel civil litigation and actual, or reasonably expected, criminal charges coexist. Sterling, 175 F. Supp. d at 576. Some of the factors recognized in the various cases as part of the weighing and balancing can have a tendency partially to duplicate each other, and not all of the factors may have application in any given case. Nonetheless, consideration of each of these factors is helpful in the weighing and balancing process.
Because there was no "live" testimony before Judge Price, but only written submissions and arguments of counsel, our review of the facts is de novo, and, as always, our review of the application of law to those facts is de novo. However, as noted earlier, the purpose of our review is to determine only if the petitioners have shown that Judge Price exceeded the discretion accorded him in determining whether to grant the requested stay.
At the February 14, 2003, hearing, counsel for RSA, Sullivan, and Ebbers agreed that Judge Price should apply a balancing-of-interests test. The factors that one or more of those parties urged him to consider were the following:
1. The status of the ongoing criminal investigation supposedly targeting Ebbers (which RSA argued might well come to naught, but which Ebbers argued represented a real and present threat of criminal prosecution) and the extent of overlap of the facts material to the civil case and the criminal investigation. Naturally, the greater the overlap, the greater the extent to which Ebbers's Fifth Amendment rights might be implicated. Looking at the situation as it existed as of Judge Price's February 26, 2003, order, we conclude that Ebbers reasonably apprehended a risk of self-incrimination if he participated in broad civil discovery. RSA acknowledged as much in its third amended complaint filed on February 20, stating in the concluding sentence of paragraph 18.1: "It is likely that defendant Ebbers will be indicted and either plead guilty to or be convicted of criminal wrongdoing for the law-violating conduct which is the subject of this case." Ebbers filed in support of his motion for a stay the affidavit of Reid H. Weingarten, an attorney specializing in representing clients in complex criminal matters, who stated that he was representing Ebbers "in connection with a federal criminal investigation relating to WorldCom, Inc." Weingarten attested that "Mr. Ebbers is the subject of an ongoing criminal investigation" relating to WorldCom and that the RSA litigation included matters "presently under review by the Department of Justice as part of its investigation of Mr. *Page 791 
Ebbers." Weingarten expressed his opinion that "there is a reasonable apprehension of a risk of self-incrimination" on the part of Ebbers, if he is forced "to provide testimony to respond to discovery in [RSA's] civil action. . . ."
2. The status of the criminal proceedings. Sullivan's criminal case was scheduled to go to trial on September 8, 2003. At the time of the hearing, Ebbers was awaiting the outcome of the then clearly ongoing criminal investigation, purportedly targeting him for the same conduct involved in the RSA litigation.
3. The burden that any particular aspect of the civil proceedings might impose on Sullivan or Ebbers. As to Sullivan, it was argued that if he had to invoke his Fifth Amendment privilege against self-incrimination with respect to civil discovery, "he essentially risks effectively forfeiting the action."
4. The convenience of the trial court in managing its cases and the efficient use of judicial resources. Sullivan argued that staying the civil action until after the criminal trial could streamline later discovery because the issues might be narrowed "in terms of discovery against Mr. Sullivan." Judge Price several times expressed his concern about the effect an indefinite stay might have on his ability to properly manage his docket and on the efficient use of judicial resources. As Judge Price expressed it, he did not know "the federal timetable" with respect to Ebbers, and he speculated that "it could take two or three years . . . the cases then may go on forever." He stated that he did not "know how long it will take the federal court to deal with Mr. Ebbers."
5. Sullivan further argued that the public interest would be served by issuing a stay as to him because it would prevent civil discovery from disclosing what certain "corroborating witnesses . . . might be saying." Also, as to the "public interest," Sullivan argued that denying him a stay would deprive him of assets needed to defend the criminal case and potentially reduce the assets that otherwise might be available for any restitution ordered in the criminal case. Sullivan pointed out that in the WorldCom litigation, Judge Cote had found that the public interest, as advanced by the intervening United States attorney for the Southern District of New York, would be served by a stay that would prevent disclosure of information being given by cooperating witnesses and would preserve Sullivan's assets for any restitution order in the criminal case.
6. With respect to the interests of persons not parties to the civil litigation, one of the attorneys for RSA suggested to Judge Price that further delay in the case (which at the time of the hearing had been pending for 7 months) could result in the State employee beneficiaries of RSA being unable to realize any eventual recovery. No other third-party interests were articulated.
7. Ebbers, for his part, relied principally on the fact that he was under scrutiny in a criminal investigation being conducted by the Justice Department, and he argued that Alabama caselaw on point required that the parallel civil proceedings be stayed as to him.
Judge Price could take judicial notice of the fact that Ebbers's motion to stay was filed on December 24, 2002, some five months after institution of the RSA litigation.
Counsel for RSA argued to Judge Price that federal caselaw established that a civil defendant facing parallel federal criminal prosecution could testify freely in the civil action without waiving his right to assert his privilege against self-incrimination in the federal criminal proceeding. Counsel *Page 792 
for Sullivan countered by pointing out that, independent of that proposition, if his client testified in the RSA litigation, the federal prosecutor could use that testimony at Sullivan's federal criminal trial, pursuant to Rules 801 and 804, Fed.R.Evid. He argued further that if Sullivan were to testify in a deposition in the civil case with regard to "other transactions or other conduct," the federal prosecutor could invoke Rule 404(b), Fed.R.Evid., to seek the admission of that testimony to show "pattern and practice" or intent.
Although the federal cases listed above identify many more ways in which the respective interests of a civil plaintiff and civil/criminal defendant can be affected by a stay, identify other instances of third-party interest, and identify other interests of the public that might be affected by a stay or by a denial of one, we look only to those factors argued before Judge Price.
Before this Court, RSA reiterates its argument that federal caselaw provides that a party giving testimony in a civil case does not waive his or her right to assert in any subsequent criminal proceeding the Fifth Amendment privilege against self-incrimination. Ebbers concedes that point but argues that under such decisions as United States v. Handley,763 F.2d 1401 (11th Cir. 1985), his deposition in the RSA litigation would be admissible against him in any subsequent federal criminal trial. Relying on the concerns endorsed in Coastal Training, 583 So.2d at 981, relating to the broad scope of civil discovery and the opportunity for that broad discovery to provide a "link in the chain of evidence" contributing to a defendant's criminal conviction, Ebbers argues that "it will be of little consequence to Defendant Ebbers if he can assert his Fifth Amendment privilege in a subsequent criminal trial if the prosecutors are armed with civil depositions and the knowledge of facts obtained through the broad course of discovery in this case." Rebutting RSA's contention in its answer that Ebbers "is currently participating in ongoing proceedings, including discovery" in the WorldCom litigation, Ebbers points out that the opinion in the WorldCom litigation states that no discovery had yet begun in that case.
Raising no challenge to the stay granted Sullivan, RSA argues that the cases from this Court that have approved of, or required, a stay of all proceedings in a civil case have been exclusively "one-on-one" cases, i.e., cases where the civil action involved only one, or at most two or three, parties on each side, and in which no interests of multiple defendants, third parties, or the public were implicated. By way of contrast, RSA points out that in its case there are many entity defendants facing no criminal exposure and that its case is but one of many civil actions across the country against Ebbers, in none of which has he been granted a stay.
RSA argues that close analysis of the opinions on point from this Court reveal that "there is much more likelihood that a stay should be granted where the defendant has actually been indicted, as opposed to simply being investigated." Ebbers's opposing argument, based on cases such asEx parte Williams, supra, is that a party may claim his Fifth Amendment privilege although no criminal charges are pending against him and even if the risk of prosecution is remote, so long as he faces a reasonable risk of criminal self-incrimination. That proposition, however, is properly seen as more directly relating to the right of a defendant successfully to invoke his Fifth Amendment privilege, rather than the secondary question of whether a stay should be granted so that he will not be forced to choose whether to invoke the privilege. Regardless of whether a stay is *Page 793 
granted or denied, a civil party facing parallel criminal proceedings cannot be deprived of the Fifth Amendment right to remain silent; he or she retains the absolute right to assert the privilege against self-incrimination. However, in connection with the weighing and balancing process, the status of the criminal proceeding can be a relevant consideration.
Citing Weems, supra, and Price I, supra, RSA argues that a stay is not always necessary to protect a party's Fifth Amendment privilege, because the trial judge in the civil action can resort to means short of a stay to protect the privilege. In Weems, after noting that the civil case and the criminal case were not parallel proceedings, the Court went on to note that the civil defendants had stated that they did not desire to obtain from the plaintiff any information that related to the pending criminal case and the trial judge had "included a safeguard for [the plaintiff]" by providing for in camera inspection of any documents or propounded questions that the civil plaintiff apprehended might incriminate him in the criminal case. 711 So.2d at 1011. In Price I, this Court upheld a denial of a civil defendant's request for a stay pending resolution of related criminal investigations because his Fifth Amendment rights could be adequately protected "while the case proceeds in some limited way." Specifically, "it appears that discovery not requiring [the defendant] either to testify or to produce documents could continue without putting [him] in a position that might call for him to incriminate himself in order to comply." 698 So.2d at 112.
As noted in our listing of principles that can be derived from this Court's relevant caselaw, a stay of a civil action may sometimes be the only method or solution sufficient to guarantee an affected party's Fifth Amendment right against self-incrimination. In the final analysis, however, whether to grant or deny a stay necessarily involves an exercise of the trial court's discretion, guided by a proper weighing and balancing of the various competing interests.
In its answer to Ebbers's petition, RSA refers us to the "balancing test" factors recited in Sterling, supra, 175 F. Supp.2d at 576-81
— the interest of the plaintiff in proceeding expeditiously and the potential prejudice to the plaintiff from a delay; the burden any particular aspect of the civil proceedings may impose on the defendant; the convenience of the court; the interest of persons not parties to the civil litigation; and the interest of the public in the pending civil and criminal litigation.
In arguing the application of those factors to this case, RSA pointed out in its answer to Ebbers's petition that the case had been pending for over eight months "with very little substantive ground covered up to the current date," allegedly because of various procedural delays occasioned by the defendants, including an attempted removal of the case to federal court.
RSA's argument in that answer that "Ebbers and the [Bank defendants] are currently participating in ongoing proceedings, including discovery, in the federal cases," has been dealt with and discounted, as far as the situation existing at the time Judge Cote wrote her opinion in WorldComLitigation. There is nothing to the contrary in the materials before us.
As to the convenience of the court and the efficient use of its judicial resources, RSA argues only that those aims "would be best served by allowing this case to proceed with Ebbers as a participating defendant and for all further delays to cease." *Page 794 
Regarding the interest of persons not parties to the civil litigation, RSA states that "taxpayers who partially fund public pensions, and more than 200,000 public pensioners, as well as investors generally, have a vested interest in insuring that . . . violators of the Alabama Securities Act are held accountable by State courts." RSA attempts to buttress this argument by attaching and quoting from its "2002 Annual Report" and its "Comprehensive Annual Financial Report" for the fiscal year ended September 30, 2001, and arguing that because of losses in the value of securities held by RSA, it will recommend to the State increased rates of contribution to fund the State employees' retirement system. RSA cites no instance where those materials or that information was communicated to Judge Price, however, and we otherwise see nothing in the materials before us reflecting that that information was brought to his attention.
In arguing the interest of the public in the pending civil and criminal litigation, RSA essentially reiterates its argument concerning the interests of persons not parties to the civil litigation, stating:
 "[T]he public interest, of RSA members and all Alabama taxpayers, were directly affected by a $275,000,000 loss in WorldCom securities and the consequent reduction in investment and investment returns. Because pension benefits are fixed, the `slack' resulting from such a loss must be made up from the public sector, in the absence of a recovery in this litigation."
(Emphasis supplied.) In this regard, RSA emphasized in its answer that, "because of the `employer [State] contribution' portion of annual contributions to the plans," RSA's "fixed-benefit retirement systems [are] not jeopardized."
Other circumstances RSA alludes to in this context are not eligible for our consideration because they are not reflected in the materials before us on these petitions. For example, RSA attaches as an appendix to its answer five news articles, which it asks this Court to take "judicial notice" of and which are said to "continue to describe federal investigators' problems in making a case against Ebbers." Ebbers attached to his memorandum brief submitted to Judge Price copies of newspaper articles tending to show the likelihood of criminal charges being brought against him; those news articles were referenced by his counsel during the February 14 hearing.
None of the articles now proffered by RSA were among those submitted to Judge Price, and we know of no legitimate basis for taking "judicial notice" of copies of news articles (all of which are shown by notations at their top to have been extracted from Internet sources). Ebbers has likewise attempted to place before us "after the fact" news articles, attaching them as exhibits to his reply brief. Those articles, tendered to show (1) that Ebbers is still the subject of an active criminal investigation and (2) that he is not participating in any way in discovery in the WorldCom litigation, both carry a publication date after the date of Judge Price's order denying Ebbers's motion for a stay. The parties have submitted to this Court other materials relating to events occurring after Judge Price's orders were issued, as will hereinafter be noted. Suffice it to say that we will not consider any of those materials in deciding whether Judge Price exceeded his discretion in denying Ebbers's motion for a stay. As we have stated in other mandamus proceedings, "[t]his Court does not review evidence presented for the first time on appeal." Ex parte Ephraim, 806 So.2d 352, 357 (Ala. 2001); "`On review by mandamus, we must look at only those facts before the trial court.'" Ex parte Ford Motor Credit *Page 795 Co., 772 So.2d 437, 442 (Ala. 2000) (quoting Ex parte Baker, 459 So.2d 873, 875 (Ala. 1984)); "[T]his Court is bound by the [materials before it], and it cannot consider a statement or evidence in a party's brief that was not before the trial court." Ex parte Pike Fabrication, Inc., [Ms. 1010388, November 22, 2002]859 So.2d 1089, 1091 (Ala. 2002). Certainly, no trial judge can be deemed to have exceeded his or her discretion on the basis of information not made known to the judge.
Two other items of information RSA presents in its answer, but that we must decline to consider as outside the materials before us, are the asserted facts that "co-defendant Arthur Andersen, who has ceased accounting operations, is a `limited fund' involved in both the Enron and WorldCom actions," and "Ebbers's DO Insurance is a `limited fund.'" We have carefully reviewed all of the materials before us, and we find no basis for either of those assertions.
RSA argues that "Ebbers may testify and participate in discovery in this proceeding without waiving any Fifth Amendment privilege. . . ." RSA acknowledges, however, that "[s]hould such an indictment be handed down [against Ebbers by a federal grand jury], the Circuit Court could revisit the issue, and would likely grant such a stay."
This Court and the trial court can take judicial notice of Rule 512A, Ala. R. Evid., which provides that "[i]n a civil action or proceeding, a party's claim of a privilege, whether in the present action or proceeding or upon a prior occasion, is a proper subject of comment by judge or counsel. An appropriate inference may be drawn from the claim." Therefore, if a stay is not granted Ebbers, and if he elects to assert his Fifth Amendment right as to any deposition questioning or document-production request, the jury in the RSA litigation could be instructed at trial that an adverse inference could be drawn against him as a result. See also Baxter v. Palmigiano, 425 U.S. 308 (1976) (there is no constitutional bar to a juror's drawing an adverse inference against a party in a civil action who invokes the Fifth Amendment and refuses to testify).
Ebbers did not contend before Judge Price, and does not contend before this Court, that should he elect to decline to provide discovery in this case he will of necessity forfeit the action.
In WorldCom Litigation, Judge Cote noted that Ebbers had not yet requested that a stay be granted as to him, but that he had reserved the right to do so at a later date. Judge Cote observed that if Ebbers could make "a showing of substantial prejudice at the discovery stage" then he might move for a stay at that time. A member of the law firm representing RSA wrote the clerk of this Court on June 12 to bring to the Court's attention an accompanying news article, stating that the article reflected that Judge Cote had ruled on May 19 that she would allow the WorldCom litigation to proceed against Ebbers. Counsel states in that letter, "I would have expected that Mr. Ebbers would have brought this to the attention of the Court and frankly I am surprised that he has not. Certainly Mr. Ebbers is in receipt of Judge Cote's order and could provide it to this Court should this Court so desire." For the reasons previously discussed, such a development, coming several months after Judge Price's order denying Ebbers's motion for a stay, would not affect our analysis of that order, our focus being on the state of affairs as presented to Judge Price. Furthermore, we have obtained a copy of Judge Cote's May 19 order, readily obtainable and reported on electronic databases as In re WorldCom, Inc., Securities Litigation (Ms. No. 02 Civ. 3288) *Page 796 
(S.D.N.Y. May 19, 2003) (not published in F. Supp.), and learn from it that Judge Cote's ruling merely denied Ebbers's motion to dismiss the "securities" litigation as to him (as distinguished from the other component of the consolidated WorldCom litigation, the "ERISA" litigation). We find that Judge Cote likewise entered an order on June 17, 2003, in the "ERISA" litigation, granting Ebbers's motion to dismiss as to one count of the complaint, but denying it as to all other courts:In re WorldCom, Inc., Erisa Litigation, (Ms. No. 02 Civ.4816 DLC, Sept. 24, 2003] (S.D.N.Y. 2003) (not published in F. Supp). Thus, the May 19 order by Judge Cote did not address whether discovery could proceed as to Ebbers, and we, therefore, are not "surprised" that counsel for Ebbers did not forward a copy of the order to this Court.
It is clear that Ebbers was the target of an ongoing, overlapping criminal investigation by the United States Department of Justice. Additionally, as stated in one of the news articles Ebbers submitted to Judge Price, there was the possibility that Mississippi prosecutors would also seek criminal charges against Ebbers. Thus, it was clear that Ebbers reasonably apprehended a risk of self-incrimination if he submitted to deposition questioning or complied with document-production requests.
Judge Price elected to stay the proceedings as to Sullivan, but only until October 1, given that Sullivan was to go to trial on September 8. He denied a similar stay to Ebbers, on the basis that, although Ebbers might be the focus of an ongoing criminal investigation, he had not been indicted.
Factoring the various principles our cases have established in this area into the weighing and balancing process and considering the various factors recognized by the federal courts, to the extent argued and developed by the parties in their submissions to Judge Price, we find that a stay in favor of Ebbers paralleling the one granted Sullivan is in order. As of Judge Price's February 26, 2003, order, Ebbers ran a clear risk of self-incrimination in the significantly overlapping criminal proceedings if he submitted to the broad discovery permissible in a civil case, and none of the other factors were then at such a level as to warrant allowing discovery to go forward as to him. Therefore, Judge Price exceeded his discretion in not granting Ebbers a stay coextensive with the stay granted Sullivan, extending until October 1, 2003.
As noted, Judge Price was advised, and relied upon the fact, that Sullivan was scheduled to go to trial on the criminal charge against him on September 8, 2003. The Bank defendants advise this Court, however, in their reply brief, that Judge Jones, who continues to oversee Sullivan's criminal case, determined on April 22, 2003, that the September 8, 2003, trial date should be canceled and the case reset, due to the return of a "superseding indictment" against Sullivan. Judge Jones has rescheduled the case for trial beginning on Monday, February 2, 2004. Naturally, this additional five-month delay in Sullivan's criminal trial alters the mix of factors. While we do not consider that changed circumstance in reviewing Judge Price's February 26, 2003, decision, we are mindful that it alters the status of the criminal proceedings against Sullivan and, perhaps secondarily, the future status of the criminal proceedings targeting Ebbers. Some of the after-the-fact submissions by the parties, which, again, we do not consider in assessing the propriety of Judge Price's orders, advise that federal prosecutors have actively been exploring a "deal" with Sullivan pursuant to which he would provide meaningful inculpatory information against Ebbers. *Page 797 
At this point, we do not attempt to forecast the landscape that the shifting sands of the WorldCom litigation, the criminal prosecution of Sullivan, and the criminal investigation of Ebbers may have shaped come October 1.
 Bank Defendants' Petition (case no. 1021008)
Turning to the petition for a writ of mandamus by the Bank defendants, we note that they filed their motion for a stay on February 4, 2003, and attached to the motion a transcript of the October 7, 2002, guilty plea of Buford Yates, Jr., who was indicted with Sullivan. In that plea, Yates identified himself as the former director of general accounting for WorldCom and stated that his supervisor was David Myers and that Sullivan was Myers's supervisor. Yates asserted that his "supervisors" instructed him and others in his department to make various irregular accounting entries, which the Bank defendants contend are "at the root of [RSA's] claims." At the February 14, 2003, hearing, which principally dealt with Ebbers's and Sullivan's motions for a stay, the Bank defendants briefly argued their positions concerning a stay as to them. Judge Price conducted another hearing on March 21, 2003, at which time the Bank defendants argued their position in more detail. They argued that they were being sued on the basis of false and materially misleading information contained in offerings for WorldCom securities issued in May 2001, as to which three of the Bank defendants were the underwriters. Their argument to Judge Price was as follows:
 "Those disclosures were based on financial statements and information prepared under the direction, supervision, and control of Mr. Sullivan. Given Sullivan's central role in the WorldCom accounting, finances, and disclosures, he is central to the Bank defendants defense in those cases. And without the ability to get discovery from Sullivan and fully litigate the issues revolving around him, the Bank defendants will suffer extreme prejudice, and will be effectively denied their right to litigate and fully defend themselves in this case. Now, the Bank defendants' position is that Sullivan and Mr. Ebbers are central to all of this litigation. RSA called Sullivan the chief architect, the chief architect of all the wrongful conduct. And they are claiming that we were co-conspirators with them."
The Bank defendants introduced at that hearing a March 12, 2003, article from the Wall Street Journal indicating that a forthcoming internal report based on a nine-month investigation by an independent law firm retained by WorldCom "indicates for the first time that Mr. Ebbers allegedly has knowledge of certain aspects of the accounting fraud, including two sets of books. . . ." The internal report supposedly would contain other information implicating Ebbers. The Bank defendants argued to Judge Price that they had been misled by WorldCom just as other parties had been misled and that it would be fundamentally unfair to require them to proceed without allowing them to pursue discovery against Sullivan and Ebbers. Judge Price commented that the Bank defendants would be able to pursue discovery against Sullivan and Ebbers "at some time" because other discovery in the RSA litigation could be conducted in the meantime and "there is a lot of discovery to go on before then . . . before you get to Sullivan and Ebbers."
In their petition to this Court, the Bank defendants contend thatBaugh, supra, stands for the proposition that the reason for staying civil proceedings as to all parties, as opposed to only the party facing criminal proceedings, is to avoid placing *Page 798 
another party in the civil suit "in the posture of having to maintain a defense without necessary discovery." Distinguishing Baugh, however, is the fact that in that case the plaintiff in the civil suit sought a stay, but only for her own benefit, because she was the subject of criminal proceedings. The only parties involved in the case were her and the individual she had sued for slander. This Court recognized that it would be grossly unfair "to stay only discovery directed to the petitioner during the course of the civil proceedings," 530 So.2d at 244, thereby allowing her to file her action and place facts in issue and then "wave the sword" of the Fifth Amendment "to avoid disclosure of such facts, and still maintain the suit." 530 So.2d at 244. The Court noted that "`[t]he scales of justice would hardly remain equal'" if a plaintiff could sue "and then be able to block all discovery attempts against him by asserting a Fifth Amendment privilege to any interrogation whatsoever upon his claim." 530 So.2d at 245 (quoting Lyons v. Johnson, 415 F.2d 540, 542 (9th Cir. 1969)). The Court declared that if any prejudice was to come from such a situation, it must "`be to the party asserting the claim and not to the one who has been subjected to its assertion.'" 530 So.2d at 245 (quoting Lyons, 415 F.2d at 542). Accordingly, the Court concluded that the only appropriate disposition was to direct the entry of a protective order staying all of the proceedings in the case until such time as the parallel criminal proceedings against the plaintiff in the civil action had been resolved. The Court did not thereby develop a "one size fits all" rule pursuant to which a stay granted in a civil case to a party facing parallel criminal proceedings must cover all parties, thereby effectively freezing any progress in the case.
Citing Price I, RSA argues that, even if a Fifth Amendment-based stay is granted to one defendant, there is no requirement that the entire case be stayed where there are other defendants. In Price I, not only had the target of criminal investigations been sued civilly, but his bonding company had also been joined as his codefendant. This Court noted that he had not indicated "why discovery could not properly proceed as to the defendant bonding company" and concluded that it was not an abuse of discretion to allow discovery to proceed in some limited fashion, so long as the party moving for the stay was not required to respond to any discovery. 698 So.2d at 112.
The Bank defendants assert in their petition that "the possibility that Mr. Sullivan and others conspired to conceal their account trickery from Arthur Andersen, and by extension from the Bank defendants, goes to the very heart of the due diligence defense that the Bank defendants will assert to the securities law claims against them." They argue:
 "A core element of the due diligence defense is whether the Bank defendants `had, after reasonable investigation, reasonable ground to believe and did believe' that the registration statement prepared for the 2001 bond offering in which [RSA] participated was true and that there was no omission of material fact, or, as to the `expertised' parts of the registration statement, whether they `had no reasonable ground to believe and did not believe' that the registration statement contained statements that `were untrue or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.' 15 U.S.C. § 77(k)(b)(3)(A) and (C), and 15 U.S.C. § 771(a)."
(Bank defendants' petition, p. 20.)
The Bank defendants go on to argue that Sullivan and other top financial executives *Page 799 
of WorldCom participated in a criminal scheme to perpetuate a massive accounting fraud and to conceal the company's true financial condition from all outsiders, including the Bank defendants. "Therefore communications and contacts between Mr. Sullivan and Arthur Andersen, the Bank defendants and others will be crucial to the factual development of this litigation and to the banks' substantive defense." (Bank defendants' petition, p. 21.)
At least two of the Bank defendants are also "underwriter defendants" in the WorldCom litigation: Salomon Smith Barney, Inc., and J.P. Morgan Chase Co. In declining to grant the underwriter defendants a stay, Judge Cote made the following observations, among others:
 "The Underwriter Defendants rely principally on the claim that they will not be able to mount an effective defense without the benefit of discovery from Sullivan and Myers. Specifically, they argue that evidence of Sullivan's and Myers'[s] alleged attempt to conceal WorldCom's true financial condition would go directly to any due diligence defense they may mount. To the extent any documents will be necessary to maintain this defense, the bulk of those documents would appear to be in the possession of WorldCom and the Underwriter Defendants themselves. The WorldCom documents already provided to Government investigators have, with limited exceptions, already been made available to all parties in the Securities Litigation."
Although the Bank defendants assert generally that they "will be severely prejudiced in their defense of this lawsuit if they are forced to proceed without discovery from Mr. Sullivan, a central figure in [RSA's] claims," including their inability to develop their "due diligence defense," they do not provide any particulars. Granted, they point out that in RSA's complaint and in the indictment returned against Sullivan, he is alleged to have been at the very heart of the accounting fraud and the conspiracy to conceal that fraud from others, including the Bank defendants, and they assert that they in good faith relied on the misinformation and the absence of information in making their own disclosures of WorldCom's financial status in the registration statements and prospectuses for the WorldCom securities issued in May 2001. They point out that RSA alleges that Sullivan and others "caused issuance of material misrepresentations in WorldCom financial reports and registration statements they signed or WorldCom issued." (Bank defendants' reply brief, p. 1.) They contend that "they were duped by Sullivan as much as [RSA] suggest[s] they were." (Bank defendants' reply brief, p. 3.)
Other than stating in general terms these and various other contentions to the effect that they will suffer enormous prejudice if they are forced to defend themselves in the RSA litigation without discovery from Sullivan, they do not explain why that would be so. Even after stating that the superseding indictment against Sullivan "should remove any doubt as to why the Bank defendants need discovery and involvement of Sullivan in order to defend themselves in this matter" (a source of information not available to Judge Price), the Bank defendants argue only that that is the case because they "were also victims of fraud and deception perpetrated by Sullivan and his cohorts, and it would be manifestly unfair to force the Bank defendants to mount a defense without the ability to obtain discovery from him." (Bank defendants' reply brief, p. 4.) They assert that discovery from Sullivan would help them defend the case not only by *Page 800 
establishing that they were victims of his alleged accounting fraud, but also "by rebutting the intent element" of the State and common-law fraud claims against them. They wish to take "extensive discovery from Sullivan to show that they undertook reasonable, good faith efforts to investigate WorldCom's financial help while Sullivan and his co-conspirators took steps to deceive the Bank defendants about WorldCom's fraudulent accounting."
Judge Price was not informed, and we are not yet informed, as to exactly how lack of access to discovery from Sullivan will thwart the ability of the Bank defendants to establish that they acted in good faith and with due diligence in investigating WorldCom's financial status, in the context of the deceptions practiced upon them by Sullivan and his co-conspirators.
Taking the Bank defendants "due diligence defense" argument at face value, it would seem that they are in control of their own destiny if Sullivan is precluded from offering testimony to contradict their position that they reasonably and in good faith relied on the information communicated to them by Arthur Andersen and WorldCom. As they describe the "due diligence defense," it does not relate to what Sullivan or others might have known but concealed; rather, it relates to the reasonableness of the inquiries and investigations by the Bank defendants and the reasonableness of their belief that the information provided them was true and complete. They will be able to explain in full detail all of the investigations and inquiries they undertook, the contents of all documents, reports, and other information provided to them, and the information otherwise coming to their attention.
It would seem that the Bank defendants are in a position, unchallenged by Sullivan or Ebbers, to state what they did, what they discovered, what they were told, and what they otherwise knew about WorldCom's situation and to defend their conduct and conclusions on the basis of reasonableness and conformity with "due diligence." As it stands, Sullivan and Ebbers are not in a position to contradict anything the Bank defendants might assert concerning just what information was transmitted to them or withheld from them. Accordingly, for all that appears, the Bank defendants are as well off, or even better off, with Sullivan and Ebbers self-muzzled, than they would be if Sullivan and Ebbers could testify in opposition to the evidence offered by the Bank defendants.
In short, the Bank defendants say they relied on what they were told, and they are completely at liberty to tell their version of what that was. Although it would appear that descriptions by the Bank defendants of what they were told would not be objectionable as hearsay, to the extent those descriptions were offered to prove why the Bank defendants took certain actions, or refrained from taking certain actions, in reliance on that information, the Bank defendants would certainly have a right to re-present their claims of prejudice resulting from the unavailability of discovery from Sullivan or Ebbers if any attempts are made to block their descriptions of the information imparted to or withheld from them.
Because Judge Price was presented only with general and conclusionary statements of the prejudice to the Bank defendants in the event they were precluded from conducting discovery as to Sullivan, he would not have exceeded his discretion in discounting those statements of potential prejudice.
Stating that they believe Ebbers's petition for a writ of mandamus has merit, given that he "is also a central figure in the WorldCom accounting fraud *Page 801 
allegations and may face criminal charges," the Bank defendants argue simply that they "also would need discovery and involvement of Ebbers in order to mount their defenses in this lawsuit." (Bank defendants' reply brief, p. 16.)
Addressing the balancing test, the Bank defendants offer the following additional considerations:
The Bank defendants foresee duplicative burdensome discovery if the civil proceedings are not stayed pending resolution of Sullivan's criminal case. They submit that his criminal trial "will undoubtedly uncover vital information about his actions and the actions of others at WorldCom," thereby increasing the discovery materials available to all parties and resulting in a narrowing of the issues in dispute. They assert in their petition, filed before the continuance of Sullivan's criminal trial, that any delay occasioned by a stay of the RSA litigation would be minimal, given Sullivan's projected September trial date. As the Bank defendants see it, information derived from Sullivan's criminal trial "will likely produce information helpful to plaintiffs' case and reduce their need for discovery in this litigation." They envision that a stay will promote judicial economy and efficiency, because it will streamline the issues in dispute and "[a] conviction or guilty plea by a civil defendant can contribute to the narrowing of issues in dispute in the overlapping civil case and may promote settlement, even among co-defendants not facing criminal charges." (Bank defendants' petition, pp. 25-27.)
RSA argues in rebuttal that the Bank defendants have yet to serve any discovery on Sullivan or any other defendant in the case, despite the fact that the case has been pending for almost nine months. The Bank defendants argue in response that "[d]iscovery was stayed under the federal Private Securities Litigation Reform Act . . . 15 U.S.C. § 77z-1b(1), until January 24, 2003, while motions to dismiss the Complaint were pending"; Judge Price denied those motions as to the Bank defendants on January 24, 2003. At that point in the proceedings, Sullivan had already filed his motion for a stay, which was granted approximately a month later. Ebbers and the Bank defendants filed their mandamus petitions when their own motions for a stay were denied. (Bank defendants' reply brief, pp. 5-6, 16.) RSA brushes aside any suggestion that a stay might benefit it and represents that "it is very possible that RSA itself will go to trial without having deposed Sullivan; that fact would not stop RSA from going forward with trial." RSA argues that it "will in fact be severely prejudiced if required to [wait] for the conclusion of Sullivan's criminal trial on the merepossibility that any possibly new information will be [sic] come forth and narrow the issues surrounding discovery." It argues that the opinion inWorldCom Litigation establishes that "the bulk of the discovery documents are either in the possession of the Bank defendants or in the public domain as provided to the government." RSA represents that "[a]s of the current date, the Bank defendants have not produced a single document to RSA" and asserts a "complete failure to respond to discovery by them."
The Bank defendants enjoy no Fifth Amendment privilege. See GeorgeCampbell Painting Corp. v. Reid, 392 U.S. 286, 288 (1968) (the constitutional privilege against self-incrimination does not enure to the benefit of any organization such as a corporation). "The privilege against self-incrimination is available only to natural persons. Corporations, therefore, are excluded generally from asserting the privilege." Charles W. Gamble, McElroy's *Page 802 Alabama Evidence § 373.01, p. 1594 (5th ed. 1996). Therefore, we analyze the Bank defendants' position under Rule 26(c), Ala.R.Civ.P., to assess whether there was "good cause shown" by them for the relief they sought. As noted earlier, broad power is granted the trial court to control the discovery process.
Giving due consideration to the factors argued to Judge Price by the Bank defendants, we find that he did not exceed his discretion in denying a stay to the Bank defendants. Accordingly, we deny the petition of the Bank defendants.
 Conclusion
We grant Ebbers's petition and direct Judge Price to vacate his order of February 26, 2003, denying Ebbers's motion for a stay and to enter an order granting a stay as to him until October 1, 2003. We deny the Bank defendants' petition.
1020931 — PETITION GRANTED; WRIT ISSUED.
HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
MOORE, C.J., dissents.
1021008 — PETITION DENIED.
MOORE, C.J., and HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
[1] Bear Stearns Co., Inc., on March 19, 2003, filed a notice of appeal from Judge Price's denial of its motion to compel arbitration. That appeal has been docketed in this Court as case no. 1020992; the last brief in it was submitted on June 12, 2003. Bear Stearns moved Judge Price to stay the entire case during the pendency of that appeal, arguing that the appeal destroyed his jurisdiction over Bear Stearns, but Judge Price denied that motion as well. That denial of the motion to stay is now before this Court by way of a petition for a writ of mandamus filed by Bear Stearns on April 22, 2003, docketed as case no. 1021164. In response to that petition, this Court entered an interim stay, pending full briefing by the parties.
[2] The third amended complaint is 222 pages. The answer filed in the trial court by defendant J.P. Morgan Chase Co., the only answer of a defendant contained among the materials the parties submitted with their petitions, is 86 pages.
[3] Note will be taken later of a "superseding" indictment filed against Sullivan on April 16, 2003, after the date Judge Price issued his orders.
[4] The materials available to this Court for consideration in deciding a petition for writ of mandamus are defined by Rule 21, Ala.R.App.P. Specifically, Rule 21(a) states that "[t]he petition shall contain a statement of the facts necessary to an understanding of the issues presented by the application; a statement of the issues presented and of the relief sought; a statement of the reasons why the writ should issue, with citations to the authorities and statutes relied on; and copies of any order or opinion or part of the record that would be essential to an understanding of the matter set forth in the petition." If this Court does not deny the petition, it orders the respondents to file "an answer to the petition" and otherwise orders the filing of briefs. (Rule 21(b).) Thus, we have before us in these mandamus proceedings only those parts of the trial court record that one or the other of the parties has chosen to offer.
[5] The year before Baugh, the Court decided Ex parte McMahan,507 So.2d 492 (Ala. 1987). In that case the civil plaintiff, who had been criminally indicted, filed a civil action against the party who had instituted the criminal proceeding and another party. Having submitted to a deposition, the plaintiff sought an order compelling the civil defendant, who was also the criminal prosecuting witness, to submit to a deposition. The trial judge, acting on his own motion, entered an order staying "all forms of discovery" pending disposition of the criminal case. Thus, the only party entitled to Fifth Amendment protection, the civil plaintiff, had voluntarily waived the privilege. Analyzing the case purely in terms of the "good cause shown" requirements for a protective order under Rule 26(c), Ala.R.Civ.P., this Court concluded the materials before it contained no showing of good cause and ordered the trial court's protective order vacated. Thus, this case is not particularly germane to the present inquiry.
[6] The Court of Civil Appeals also has had an occasion to address the issue, in Lowe v. Lowe, 561 So.2d 240 (Ala.Civ.App. 1990). However, because none of the parties cite that case, and because it simply followed the teachings of Baugh, which this Court has fully developed subsequent to Lowe, it need not enter further into our discussions.